AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court

for the
**Western District of New York**

FILED
AUG – 3 2021
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

**United States of America**

v.

Case No. 21-mj-5143

### HORMOZ MANSOURI

*Defendant*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between in or about March 2020 and in or about May 2021, in the Western District of New York and elsewhere, the defendant did commit violations of Wire Fraud, Bank Fraud, Conspiracy to Commit Wire Fraud and Bank Fraud, and Money Laundering in violation of Title 18, United States Code, Sections 1343, 1344, 1349, 1956, and 1957.

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_____
*Complainant's signature*

ALLAN RAINS, Special Agent
Federal Bureau of Investigation
_____
*Printed name and title*

Sworn to before me telephonically.

Date: __August 3__, 2021

_____
*Judge's signature*

HONORABLE MICHAEL J. ROEMER
UNITED STATES MAGISTRATE JUDGE
_____
*Printed name and title*

City and State: __Buffalo, New York__

## AFFIDAVIT IN SUPPORT OF
## A CRIMINAL COMPLAINT

STATE OF NEW YORK )
COUNTY OF ERIE      )     ss.:
CITY OF BUFFALO    )

### I.     INTRODUCTION

I, Allan Rains, being duly sworn, deposes and says:

1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since 2001. The FBI is an agency within the United States Department of Justice, which is a department within the executive branch of the United States Government. I am currently assigned to the Buffalo Field Office and to the White-Collar Crime Squad within that office. My duties include the investigation of such offenses as bank fraud, investment fraud, money laundering, corporate fraud, mail fraud, wire fraud, public corruption, bankruptcy fraud and other white-collar crimes.

2.     As a Special Agent with the FBI, I have received training related to the enforcement of various statutes of the United States Code, specifically, but not limited to, Title 18, United States Code, Sections 1343 (Wire Fraud), 1344 (Bank Fraud), 1349 (Conspiracy to Commit Wire Fraud and Bank Fraud) and 1956 and 1957 (Money Laundering). I have become knowledgeable about criminal activity in connection with the Small Business Administration's Paycheck Protection Program and Economic Injury

Disaster Loan program, and particularly violations of laws prohibiting offenses such as conspiracy, wire fraud, bank fraud, and money laundering.

3.　　The facts set forth below are based upon my personal observations, my training and experience, and information obtained during the course of the investigation from other members of law enforcement, involving the review of records, interviews of witnesses, and information and reports provided. This affidavit is intended to show merely that there is sufficient probable cause for the Criminal Complaint and does not purport to set forth all of my knowledge of the investigation into this matter.

4.　　This affidavit is made in support of the issuance of a Criminal Complaint charging HORMOZ MANSOURI (hereinafter "MANSOURI") with Wire Fraud, Bank Fraud, Conspiracy to Commit Wire Fraud and Bank Fraud, and Money Laundering in violation of Title 18, United States Code, Sections 1343, 1344, 1349, 1956, and 1957.

## II.　　RELEVANT STATUTORY AUTHORITY

5.　　The following legal statutes will be discussed throughout this affidavit:

**Title 18, United States Code, Section 1343** provides in relevant part:
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall   be fined, imprisoned or both.

**Title 18, United States Code, Section 1344** provides in relevant part:

Whoever knowingly executes, or attempts to execute, a scheme or artifice to defraud a financial institution or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises shall be fined, imprisoned or both.

**Title 18 United States Code (U.S.C.), § 1349** provides in relevant part:

Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

**Title 18, United States Code, Section 1956(c)(7)** provides in relevant part:

**(c)**

> **(7)** the term "specified unlawful activity" means—
>
> > **(A)** any act or activity constituting an offense listed in section 1961(1) of this title [including 1343, 1344, and 1349].

**Title 18, United States Code, Section 1956(a)(1)(B)(i)** provides in relevant part:

**(a)**

> **(1)** Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> > **(B)** knowing that the transaction is designed in whole or in part—
> >
> > **(i)** to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

**Title 18, United States Code, Section 1957** provides in relevant part:

> **(a)** Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from

3

specified unlawful activity, shall be punished as provided in subsection (b).

## III.  PROBABLE CAUSE

## United States Small Business Administration

6.      The United States Small Business Administration ("SBA") is a United States government agency, headquartered in Colorado that provides support to entrepreneurs and small businesses.  The SBA was created in 1953 as an independent agency of the federal government to aid, counsel, assist and protect the interests of small business concerns, to preserve free competitive enterprise and to maintain and strengthen the overall economy of our nation.  The SBA aids and assists small businesses in the economic recovery of communities after disasters.  Two programs administered by the SBA to assist entrepreneurs and small businesses are the Paycheck Protection Program and Economic Injury Disaster Loan programs.

## Overview of the Paycheck Protection Program and Economic Injury Disaster Loan Program

7.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection

Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding. In December 2020, Congress passed the COVID Relief Plan authorizing an additional $284 billion in further PPP forgivable loans. In February 2021, Congress passed the American Rescue Plan Act of 2021 which authorized an additional $7.25 billion in PPP funding. The PPP program reopened on January 11, 2021 and closed on May 31, 2021.

8.      In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application, signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation in support of their payroll expenses.

9.      A PPP loan application must be processed by a participating lender. If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

10.     PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

11.     A second source of relief provided by the CARES Act is the funding to the SBA for the Economic Injury Disaster Loan ("EIDL") Program.  The EIDL program is designed to provide economic relief to businesses that are currently experiencing a temporary loss of revenue due to COVID-19.  The program provides low interest loans of up to $2 million to pay for expenses that could have been met had the pandemic not occurred, including payroll, paid sick leave for employees, increased production costs due to supply chain disruptions, and business obligations such as debts, rent and mortgage payments. Related to the COVID-19 pandemic, the maximum amount available for an EIDL was $150,000, however, the SBA announced beginning in or around April 6, 2021, the maximum EIDL amount was increased to $500,000. In addition to the EIDL program loans, small businesses could request an EIDL Advance from $1,000 up to $10,000, based on the number of employees indicated on the EIDL application.  The EIDL Advance was a grant and therefore did not have to be repaid.

12.     As with the PPP loan, to obtain an EIDL, a qualifying business must submit a loan application signed by an authorized representative of the business.  As with the PPP loan, the EIDL application required the business (through its authorized representative) to

acknowledge the program rules and make certain affirmative certifications to be eligible to obtain these loans. Unlike the PPP loan, the EIDL loans are processed and funded directly from the SBA, not through a participating lender. The information from applications for both the PPP and EIDL programs, however, is transmitted to and held by the SBA.

## Overview of the Scheme

13.     The scheme involves the use of email, lenders' online PPP and EIDL loan application processes, and financial institution funds-wiring processes, in order to fraudulently obtain PPP and EIDL loan funds. Specifically, MANSOURI and others transmitted, or caused to be transmitted, multiple PPP and EIDL loan applications that contained materially false statements and supporting documentation to SBA approved lenders and the SBA. Reliance on this false information caused multiple federally insured financial institutions and the SBA to send, through interstate wires, significant funds to bank accounts controlled by MANSOURI in the Western District of New York. MANSOURI would then routinely transfer the funds back and forth through numerous bank accounts, often times in excess of $10,000, in an attempt to conceal or disguise the nature, location, source, ownership, or control of the proceeds.

## Background on Hormoz Mansouri

14.     MANSOURI operates several business entities in the Western District of New York, to include HLM Holding LLC, EI Team Inc., NPTS Inc., 2060 Sheridan Drive LLC, 212 Holden Avenue LLC, 350 Old Niagara Falls Boulevard LLC, 47 East Amherst LLC, and

7

3600 Harlem Road LLC. According to the New York State Department of State (hereinafter "NYS DOS") website, the address to which the NYS DOS will mail process related to each of the aforementioned businesses is 2060 Sheridan Drive, Buffalo, New York 14223. 2060 Sheridan Drive is the same address associated with MANSOURI in player records obtained from the Seneca Gaming Corporation.

### *Relevant Entities*

15.    HLM Holding LLC (hereinafter "HLM") is believed to be a holding company for MANSOURI's business ventures which, according to the NYS DOS website, was established on or about June 25, 1997, and the address is 2060 Sheridan Drive, Buffalo, New York 14223. In loan applications and bank records, MANSOURI is listed as the owner/managing partner.

16.    2060 Sheridan Drive LLC (hereinafter "2060 Sheridan Dr.") is a limited liability company which, according to the NYS DOS website, was established on or about December 6, 2012, and the address is 2060 Sheridan Drive, Buffalo, New York 14223. In loan applications and bank account opening records, MANSOURI is listed as the majority owner/managing sole member.

17.    212 Holden Avenue LLC (hereinafter "212 Holden") is a limited liability company which, according to the NYS DOS website was established on or about July 21, 2010, and the address is 2060 Sheridan Drive, Buffalo, New York 14223. In loan applications and bank account opening records, MANSOURI is listed as the owner/managing partner.

8

18.    350 Old Niagara Falls Boulevard LLC (hereinafter "350 Old NFB") is a limited liability company which, according to the NYS DOS website, was established on or about December 7, 2012, and the address is 2060 Sheridan Drive, Buffalo, New York 14223. In loan applications and bank account opening records, MANSOURI is listed as the majority owner/sole member.

19.    47 East Amherst LLC (hereinafter "47 E Amherst") is a limited liability company which, according to the NYS DOS website, was established on or about June 19, 2007, and the address is 2060 Sheridan Drive, Buffalo, New York 14223. In loan applications and bank account opening records, MANSOURI is listed as the majority owner/managing member.

20.    EI Team Inc. (hereinafter "EIT") is a corporation which, according to the NYS DOS website, was established on or about September 17, 1921, and the address is 2060 Sheridan Drive, Buffalo, New York 14223. In loan applications and bank account opening records, MANSOURI is listed as the owner.

21.    NPTS Inc. (hereinafter "NPTS") is a corporation which, according to the NYS DOS website, was established on or about January 14, 1983, and the address is 2060 Sheridan Drive, Buffalo, New York 14223. In loan applications, MANSOURI is listed as the owner.

22.    3600 Harlem Road LLC (hereinafter "3600 Harlem") is a limited liability company which, according to the NYS DOS website, was established on or about December

9

7, 2012, and the address is 2060 Sheridan Drive, Buffalo, New York 14223. In loan applications and bank account opening records, MANSOURI is listed as the majority owner/managing sole member.

23.     Mansouri for County Comptroller is a name which was utilized to establish a bank account at M&T Bank on April 23, 2021. The address associated with this bank account was 2060 Sheridan Drive, Buffalo, New York 14223. MANSOURI was the only authorized signatory on the bank account.

### *Other Relevant Entities*

24.     M&T Bank is a federally insured financial institution with headquarters in Buffalo, New York. M&T Bank has over 700 domestic branches with locations in several states within the United States, to include New York, Maryland, New Jersey, Pennsylvania, Delaware, Connecticut, Virginia, and West Virginia. As such, M&T Bank is a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce. PPP funds received from 16 loans were deposited into at least eight M&T Bank accounts controlled by MANSOURI totaling approximately $3,074,000. In addition, M&T Bank received funds derived from at least seven EIDL applications totaling approximately $450,600 into accounts controlled by MANSOURI.

25.     As described in detail below, there is probable cause to believe that MANSOURI and others transmitted, or caused to be transmitted, several materially

fraudulent PPP and EIDL loan applications to SBA approved lenders and the SBA, and thereafter used the PPP and EIDL loan funds to make impermissible purchases. Additionally, MANSOURI and others did knowingly execute, or attempt to execute, a scheme or artifice to defraud financial institutions or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of financial institutions, to wit, M&T Bank and other financial institutions, by means of materially false and fraudulent pretenses, representations, or promises.

26.     The other individuals involved in the scheme included at least two employees of the MANSOURI entities.   These employees were included on communications and correspondence with the SBA and financial institutions, and in some instances, communicated and corresponded directly with the SBA and financial institutions in furtherance of the conspiracy to obtain the fraudulent loans.   These two employees reported directly to MANSOURI, and took direction from MANSOURI.

*Summary of Funded PPP Loans to Mansouri Controlled Entities*

27.     The eight MANSOURI controlled entities applied for and provided fraudulent representations and documentation for numerous PPP loans.   There were ultimately 16 PPP loans funded (two per entity) by various financial and lending institutions.   The below chart summarizes the 16 funded PPP loans:

11

| ENTITY | LOAN TYPE | PPP APP ENDING | AVERAGE MONTHLY PAYROLL (PER PPP APP) | PPP AMOUNT APPROVED | DATE FUNDED | WIRED TO M&T BANK ACCOUNT ENDING | FUNDING FINANCIAL INSTITUTION |
|---|---|---|---|---|---|---|---|
| EI TEAM | PPP | 0248 | 95,503.00 | 238,757.50 | 04/20/20 | 2678 | M&T BANK |
| EI TEAM | PPP | 7555 | 109,833.00 | 274,582.00 | 01/29/21 | 2678 | M&T BANK |
| NPTS | PPP | 8939 | 56,661.00 | 141,652.50 | 04/22/20 | 2928 | M&T BANK |
| NPTS | PPP | 4517 | 109,833.00 | 274,582.00 | 01/29/21 | 2928 | M&T BANK |
| HLM HOLDING | PPP | 5948 | 33,333.00 | 83,332.00 | 05/28/20 | 5884 | FC MARKETPLACE |
| HLM HOLDING | PPP | 0397 | 109,833.00 | 274,582.00 | 02/17/21 | 5884 | CRB BLUEVINE |
| 2060 SHERIDAN | PPP | 3764 | 33,333.00 | 83,300.00 | 06/12/20 | 3454 | LIBERTY |
| 2060 SHERIDAN | PPP | 2826 | 109,833.00 | 274,582.00 | 02/17/21 | 3454 | CUSTOMERS BANK |
| 212 HOLDEN | PPP | 3461 | 33,333.00 | 83,300.00 | 06/12/20 | 0135 | LIBERTY |
| 212 HOLDEN | PPP | 2824 | 109,833.00 | 274,582.00 | 02/17/21 | 0135 | CUSTOMERS BANK |
| 350 OLD NFB | PPP | 3413 | 33,333.00 | 83,332.00 | 06/11/20 | 2274 | FUNDBOX |
| 350 OLD NFB | PPP | 7414 | 109,833.00 | 274,582.00 | 02/17/21 | 2274 | CUSTOMERS BANK |
| 47 E AMHERST | PPP | 1113 | 32,820.52 | 82,051.30 | 06/11/20 | 3470 | FUNDBOX |
| 47 E AMHERST | PPP | 4622 | 109,833.00 | 274,582.00 | 02/11/21 | 3470 | CUSTOMERS BANK |
| 3600 HARLEM | PPP | 1126 | 32,820.56 | 82,051.40 | 06/18/20 | 2720 | FUNDBOX |
| 3600 HARLEM | PPP | 8538 | 109,833.00 | 274,582.00 | 02/25/21 | 2720 | CUSTOMERS BANK |
| | | | | $3,074,432.70 | | | |

28.     The amount funded for PPP loans is calculated by the financial and lending institutions by taking the average monthly payroll provided by the borrower on the application and other supporting documents provided to the institution and multiplying that number by 2.5. The intended purpose of the PPP loan program was to provide businesses with funding for approximately 10 weeks of payroll (approximately two and a half months). For each of the 16 PPP loans funded for the MANSOURI controlled entities, the average monthly payroll was inflated or completely fabricated. In fact, contrary to the representations made in the application process, six of the eight entities did not have any actual employees or payroll expenses.

29.     The New York State Department of Labor (hereinafter "DOL") requires liable employers to report their payroll and pay unemployment insurance contributions. The DOL maintains records of paid wages by entity and by employee. Records were obtained from DOL for each of the MANSOURI controlled entities. The below chart provides a comparison of the average monthly payroll provided to the lending institutions in the application process for the 16 funded PPP loans against records obtained from the DOL:

| ENTITY | LOAN TYPE | PPP APP ENDING | AMOUNT APPROVED | DATE FUNDED | AVERAGE MONTHLY PAYROLL (PER PPP APP) | ACTUAL AVERAGE MONTHLY PAYROLL (PER NYS DOL) |
|---|---|---|---|---|---|---|
| EI TEAM | PPP | 0248 | 238,757.50 | 04/20/20 | 95,503.00 | 54,905.79 |
| EI TEAM | PPP | 7555 | 274,582.00 | 01/29/21 | 109,833.00 | 54,905.79 |
| NPTS | PPP | 8939 | 141,652.50 | 04/22/20 | 56,661.00 | 10,588.04 |
| NPTS | PPP | 4517 | 274,582.00 | 01/29/21 | 109,833.00 | 10,588.04 |
| HLM HOLDING | PPP | 5948 | 83,332.00 | 05/28/20 | 33,333.00 | - |
| HLM HOLDING | PPP | 0397 | 274,582.00 | 02/17/21 | 109,833.00 | - |
| 2060 SHERIDAN | PPP | 3764 | 83,300.00 | 06/12/20 | 33,333.00 | - |
| 2060 SHERIDAN | PPP | 2826 | 274,582.00 | 02/17/21 | 109,833.00 | - |
| 212 HOLDEN | PPP | 3461 | 83,300.00 | 06/12/20 | 33,333.00 | - |
| 212 HOLDEN | PPP | 2824 | 274,582.00 | 02/17/21 | 109,833.00 | - |
| 350 OLD NFB | PPP | 3413 | 83,332.00 | 06/11/20 | 33,333.00 | - |
| 350 OLD NFB | PPP | 7414 | 274,582.00 | 02/17/21 | 109,833.00 | - |
| 47 E AMHERST | PPP | 1113 | 82,051.30 | 06/11/20 | 32,820.52 | - |
| 47 E AMHERST | PPP | 4622 | 274,582.00 | 02/11/21 | 109,833.00 | - |
| 3600 HARLEM | PPP | 1126 | 82,051.40 | 06/18/20 | 32,820.56 | - |
| 3600 HARLEM | PPP | 8538 | 274,582.00 | 02/25/21 | 109,833.00 | - |
| | | | $3,074,432.70 | | | |

30.     The "actual average monthly payroll" column in the above chart was calculated by taking total wages for 2019 and 2020 for the MANSOURI controlled entities and dividing the total by 24 months.  It should be noted that wages reported to DOL remained relatively consistent throughout the two year period.  Based in part on the analysis of the DOL records, had the MANSOURI controlled entities provided legitimate payroll information on the applications, the entities would have qualified for smaller loan amounts or no loans at all. EIT and NPTS would have qualified for smaller loans and none of the other entities would have qualified for any loans.

*Summary of Funded EIDL Loans to Mansouri Controlled Entities*

31.     The MANSOURI controlled entities applied for and provided fraudulent representations and documentation for numerous EIDL's to the SBA for his eight entities. There were ultimately seven EIDL's for which the MANSOURI controlled entities received an EIDL Advance, EIDL or both.  The below chart summarizes the seven funded EIDL's:

| ENTITY | LOAN TYPE | EIDL APP ENDING | NUMBER OF EMPLOYEES (PER EIDL APP) | REVENUES (PER EIDL APP) | COST OF GOODS (PER EIDL APP) | EIDL AMOUNT FUNDED | DATE FUNDED | WIRED TO M&T BANK ACCOUNT ENDING |
|---|---|---|---|---|---|---|---|---|
| EI TEAM | EIDL ADVANCE | 9025 | 13 | 2,000,000.00 | 1,195,275.00 | 10,000.00 | 04/14/20 | 2678 |
| EI TEAM | EIDL | 9025 | 13 | 2,000,000.00 | 1,195,275.00 | 149,900.00 | 05/11/20 | 2678 |
| NPTS | EIDL | 6170 | 4 | 2,000,000.00 | 1,925,000.00 | 37,400.00 | 06/01/20 | 2928 |
| HLM HOLDING | EIDL ADVANCE | 5513 | 0 | 118,250.00 | 119,228.00 | 1,000.00 | 04/13/20 | 5884 |
| 2060 SHERIDAN | EIDL | 6177 | 4 | 2,500,000.00 | 2,250,000.00 | 124,900.00 | 06/22/20 | 3454 |
| 350 OLD NFB | EIDL ADVANCE | 4461 | 4 | 2,500,000.00 | 2,250,000.00 | 4,000.00 | 06/19/20 | 2274 |
| 350 OLD NFB | EIDL | 4461 | 4 | 2,500,000.00 | 2,250,000.00 | 37,600.00 | 06/23/20 | 2274 |
| 47 E AMHERST | EIDL ADVANCE | 8594 | 4 | 2,500,000.00 | 2,250,000.00 | 4,000.00 | 06/19/20 | 3470 |
| 47 E AMHERST | EIDL | 8594 | 4 | 2,500,000.00 | 2,250,000.00 | 38,900.00 | 06/22/20 | 3470 |
| 3600 HARLEM | EIDL | 0455 | 4 | 2,500,000.00 | 2,250,000.00 | 42,900.00 | 06/22/20 | 2720 |
| | | | | | | $ 450,600.00 | | |

32.     The amount funded for EIDL Advances was based upon the number of employees provided to the SBA on the loan application ($1,000 per employee up to a $10,000 maximum per entity).  The EIDL is calculated by the SBA by taking the reported revenues minus cost of goods for the 12 months prior to January 31, 2020.  The difference was then divided by two in order to calculate the amount of working capital needed for a six month period.  For entities which had a cost of goods in excess of revenues, they did not qualify for an EIDL.  For each of the MANSOURI controlled entities which received an EIDL, the revenue and cost of goods which were reported to the SBA were fabricated.

### *Additional Information in Support of the Scheme*

33.     MANSOURI maintained at least one bank account at M&T Bank in the name of each of the entities where the proceeds for each loan were deposited via wire transfer as described in the charts. Some of these accounts were opened in May 2020 just prior to the receipt of PPP/EIDL funds.  In addition, MANSOURI is the sole signatory for each account, with the exception of the EIT account ending 2678, NPTS account ending 2928, and HLM account ending 5884.  MANSOURI and his wife were the signatories for these three bank accounts.

34.     A review of the bank records for each of the entities from the date of the account opening, or January 1, 2019, whichever was later, through May 14, 2021 did not reveal any payroll expenses for any of the entities in the above table with the exception of payroll expenses for EIT and NPTS.  The bank records support the fact that the payroll provided for

15

the PPP loan applications for EIT and NPTS were inflated and the payroll provided for the other entities was completely fabricated.

35.     Additionally, the eight PPP loans listed in the above table referenced in paragraph 27, which were funded between January 29, 2021 and February 25, 2021, were for identical amounts ($274,582).   In each of the eight loans, the financial institution was provided documents representing an average monthly payroll amount of $109,833.  From my experience, it is extremely unlikely that each of the eight entities would incur the exact same monthly payroll amount.  Additionally, bank analysis does not substantiate any of the payroll amounts provided on the applications.

36.     Through the course of the investigation, email communications between MANSOURI and two of his employees have been reviewed.   In some of these communications, MANSOURI directed the employees to falsify information on the loan applications for both the PPP and EIDL loans.  For example, MANSOURI directed the employees to fabricate documents required by the financial and lending institutions to substantiate payroll expenses and directed the employees how to answer questions posed by the institutions.  Many of the documents which were fabricated and subsequently submitted to the institutions were signed by MANSOURI.

37.     Many of the transfers of the funds from the financial and lending institutions and the SBA identified in the tables above, were interstate wires from outside the State of

16

New York to the MANSOURI controlled bank accounts maintained in the Western District of New York.

38.    Once funds were received from the financial and lending institutions and SBA by the MANSOURI controlled entities, MANSOURI did utilize a portion of the funds to pay payroll and operate the businesses.   Included in the payroll expenses were payroll for MANSOURI, his wife, and his daughter. In addition to the amounts received by MANSOURI through payroll, in excess of $300,000 was transferred from the MANSOURI controlled business accounts to personal bank accounts, over $321,000 was utilized to pay credit cards controlled by MANSOURI (much of which was for expenses related to casino activity), two checks were drawn on the HLM account ending 5884 in the amount of $60,000 and $66,000 respectively which were utilized to purchase M&T Bank Cashier's checks payable to a casino, and $200,000 was transferred to a newly opened bank account for a political campaign in the name of "Mansouri for County Comptroller".

39.    On May 28, 2021, seizure warrants for the MANSOURI controlled accounts were authorized by the United States District Court for the Western District of New York, case number 21-MC-29. Those warrants resulted in the seizure of approximately $1,923,603.

### Money Laundering

40.    Throughout this scheme, MANSOURI utilized the PPP and EIDL loan proceeds in a complicated set of transactions between the various business accounts. By moving the proceeds through the various accounts, commingling with legitimate business revenues, and transferring funds back into different business accounts, his personal accounts,

to a campaign account, or to a casino, MANSOURI concealed, disguised and obscured the source, nature, ownership, control, or location of the funds which were derived from the scheme to defraud. As a result, MANSOURI utilized each account described herein to knowingly conduct financial transactions affecting interstate commerce, which involved the proceeds of specified unlawful activity, that is, wire fraud, bank fraud, and conspiracy to commit these frauds, with the intent to conceal and disguise the nature, the location, the source or the control of the proceeds, and that while conducting such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957.

41.     Based on my training and experience, businesses funded with legitimate income do not behave in the manner described herein. The complicated movement of funds between the bank accounts appear designed to obfuscate the true source of the funds. Further, the opening of bank accounts in the days prior to obtaining a PPP or EIDL loan and the subsequent transfers of the loan proceeds out of those accounts display an effort to conceal and disguise the nature, source, location, or control of the proceeds. These facts, together with the transfer of PPP and EIDL proceeds to the MANSOURI campaign account, cashier's checks to a casino, and transfers to his personal accounts, demonstrate that MANSOURI and the MANSOURI controlled entities were involved in money laundering transactions.

42.     Including the $126,000 paid from HLM to a casino as noted above, between April 2020 and May 2021, MANSOURI transferred, caused to be transferred or paid approximately $644,805 to a casino, much of which was funded with PPP or EIDL proceeds.

These payments were made from business accounts, as well as from proceeds transferred from business accounts to his personal accounts.

43.     Each account was also used to transfer from and receive proceeds in excess of $10,000 after receiving PPP and EIDL funds.  Each account was utilized for this purpose at least one time and sometimes dozens of times in violation of Title 18, United States Code § 1957.

## IV.    CONCLUSION

44.     Wherefore, in consideration of the foregoing, I respectfully submit that between in or about March 2020 and in or about May 2021, in the Western District of New York, and elsewhere, the defendant, HORMOZ MANSOURI did commit violations of Wire Fraud, Bank Fraud, Conspiracy to Commit Wire Fraud and Bank Fraud, and Money Laundering in violation of Title 18, United States Code, Sections 1343, 1344, 1349, 1956, and 1957.  I respectfully request that a Criminal Complaint for MANSOURI be issued.

ALLAN RAINS, Special Agent
Federal Bureau of Investigation

Sworn to before me telephonically this 3rd day of August, 2021.

HONORABLE MICHAEL J. ROEMER
United States Magistrate Judge

19